Todd M. Logan (SBN – 305912)
tlogan@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Attorney for Plaintiff and the Putative Class*

[Additional counsel appear on the signature page.]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL LEE COOK, individually and on behalf of all others similarly situated, | Case No.: 3:16-cv-2630 |
| *Plaintiff,* | **COMPLAINT FOR:** |
| *v.* | 1. **Negligence;**<br>2. **Fraudulent Concealment;** |
| PAC-12 CONFERENCE, and THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | 3. **Breach of Express Contract;**<br>4. **Breach of Implied Contract;**<br>5. **Breach of Third-Party Express Contract; and**<br>6. **Unjust Enrichment.** |
| *Defendants.* | **DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiff Daniel Lee Cook brings this Class Action Complaint and Demand for Jury Trial against Defendants Pac-12 Conference, f/k/a Athletic Association of Western Universities ("Pac-12") and the National Collegiate Athletic Association ("NCAA" and, together with the Pac-12, "Defendants") to obtain redress for all persons injured by their reckless disregard for the health and safety of generations of University of Oregon student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.      Football is *America's* sport. Nearly one hundred thousand student-athletes sign up to compete in college football each year. Millions of fans dedicate an entire day each week during football season to watching those kids play. On game days, tens of thousands of fans fill stadium seats nationwide (and even more watch around the world). Before each game, players as young as eighteen years old are told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going. Ultimately, college football players like Plaintiff Cook—and the Class of football players defined below—were raised to live and breathe the game.

2.      Unfortunately, until 2010, Defendants Pac-12 and the NCAA kept college football players (and the public) in the dark about an epidemic that was slowly killing student-athletes.

3.      During the course of a college football season, athletes can receive more than 1,000 impacts greater than 10g's (gravitational forces). The majority of football-related hits to the head exceed 20g's. To put this in perspective, if you drove you car into a wall at twenty-five miles per hour and you weren't wearing a seatbelt, the force of you hitting the windshield would be around 100g's. That means that each season, thousands of student-athletes are subjected to the equivalent of several *hundred* car accidents.

4.      Over time, repetitive and violent impacts to players' heads lead to repeated concussions, which in turn severely increase the risks of long term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms.

5.      For decades, Defendants Pac-12 and the NCAA, in addition to the University of Oregon, knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but actively concealed this information to protect the very profitable business of "amateur" college football.

6.      While in school, University of Oregon football players were under Defendants Pac-12's and the NCAA's care. Unfortunately, Defendants Pac-12 and the NCAA, along with the University of Oregon, prioritized on-field performance over the off-field consequences that would haunt their student-athletes for the rest of their lives.

7.      Despite knowing for decades of a vast body of scientific research describing the danger of TBIs, Defendants failed to implement procedures to protect Plaintiff and other University of Oregon football players from the long-term dangers associated with them. They did so knowingly and for profit.

8.      As a direct result of Defendants' actions (or lack thereof), Plaintiff and a Class of former players (defined below) now suffer from neurological and cognitive damage, including symptoms of traumatic encephalopathy.

**PARTIES**

9.      Plaintiff Daniel Lee Cook is a natural person and citizen of the State of Washington.

10.     Defendant Pac-12 Conference, f/k/a Athletic Association of Western Universities, is a collegiate athletic conference with its principal office located at 360 3rd Street, 3rd Floor, San Francisco, California 94107. Defendant Pac-12 conducts business throughout this District, the State of California, and the United States.

11.     Defendant NCAA is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA conducts business throughout this District, the State of California and the United States.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §

1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of exceptions under that subsection apply to this action.

13.     This Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts here, and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated in part from this District.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Pac-12 resides in this District and because Defendants conduct significant business in this District, including establishing consumer and business contracts here.

### INTRADISTRICT ASSIGNMENT

15.     Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

### FACTUAL BACKGROUND

**I.     The NCAA and Pac-12 Had a Duty to Protect Their Student-Athletes.**

16.     Defendant NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including in the Pac-12 and the football program at University of Oregon. According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes – on the field, in the classroom, and in life."[1]

17.     To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition. Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known schools, with high ranking teams, larger budgets, better facilities, and more athletics scholarships.

18.     Each NCAA Division is composed of several "conferences" to facilitate regional league play. University of Oregon is a Division I football team in the Pac-12 Conference. The Pac-

---

[1]     Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), http://www.ncaa.org/about/who-we-are/membership.

12 operates in the Western United States and participates in 22 NCAA sports. The Pac-12's members are located in Arizona, California, Colorado, Oregon, Utah, and Washington. The University of Oregon has one of the most dominant football programs in the United States, having played in two national championships since 2010. Oregon attracts top high school talent from across the nation and enjoys a national television audience. Oregon football generates well over $51 million in revenue for the school each year and year after year ranks among the top teams in the country.

19.     Collectively, Defendants govern and regulate the University of Oregon football program and owe a duty of care to safeguarding the well being of its student-athletes.

20.     In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[2] The IAAUS was specifically formed for this purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the association was established.[3] As such, the genesis of the NCAA was for a singular goal: student-athlete safety.

21.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives[, but that each] division creates its own rules that follow the overarching principles of the NCAA."[4]

22.     The overarching principles of the NCAA, including its purported commitment to safeguarding its student-athletes, are contained in the NCAA Constitution. The NCAA Constitution

_____
[2]     About the NCAA, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), http://www.ncaa.org/about.
[3]     In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.
[4]     Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), http://www.ncaa.org/about/who-we-are/membership.

clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for student-athletes;
>
> (b)  To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b).

23.  The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

24.  Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2. The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> **2.2.3 Health and Safety.**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

25.  To accomplish this purported purpose, NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions, including athletic conferences like the SEC, are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate

athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

26.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[5]

27.     To provide member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that the "Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations. . . ." NCAA Const., Art. 2, § 2.8.2.

28.     Likewise, according to the NCAA Constitution, a member conference is entitled to all of the privileges of active members, except the right to compete in NCAA championships. *See* NCAA Const., Art. 3, § 3.02.3.2. Member "conferences of [the NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association." NCAA Const., Art. 3, § 3.3.4.

29.     The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which the student-athletes, Pac-12, and University of Oregon (*i.e.*, member institutions) can rely upon for guidance on player-safety issues.

30.     As a member conference, Pac-12 is charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of University of Oregon football players, including Plaintiff.

31.     Likewise, as a member institution, University of Oregon is charged with

---

[5]     *See, e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

implementing and enforcing those guidelines in a meaningful way to protect the health and safety of University of Oregon football players, including Plaintiff.

32.     As members of the NCAA, Pac-12 and Oregon are obligated to help protect the health and safety of its student-athletes and agreed to abide by the NCAA Constitution.

33.     As compared to Plaintiff and other University of Oregon football players, Pac-12 and University of Oregon were in superior positions to know of and mitigate the risks of concussions and other TBIs.

**II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.**

34.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions with a heightened risk of long term traumatic brain injuries (or TBI), including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related symptoms. To better understand the results of these studies, a brief introduction to concussions in football follows.

*A.     An Overview of Concussions in Football.*

35.     A concussion is a traumatic brain injury caused by an impact that causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist in the skull, damaging brain cells and creating chemical changes in the brain.

36.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

37.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes can receive more than 1,000 impacts greater than 10g (or gravitational) force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20g's.

38.     Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s: in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning."

       i.     Concussion Symptoms.

39.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss, such as trouble remembering things that happened right before and after the injury;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

- feeling anxious or irritable for no apparent reason; or

- feeling overly tired.

40.     A student-athlete may not recognize the signs or symptoms of a concussion, or, more likely, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

       ii.     Post-Concussion Treatment.

41.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is

particularly vulnerable to further injury.

42.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

43.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

44.     Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions are anything but temporary.

B.     *Studies Confirm the Dangers and Long-Term Effects of Concussions*.

45.     The two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau

46.     Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters and Nash killed themselves, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristic of CTE, which is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma.

47.     Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94  (96%) of autopsied brains of former NFL players. He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

48.     Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

49.     Unfortunately, studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions and other TBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

50.     For instance, in 1928, pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out our or who had suffered a considerable impact to the head. *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

51.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function. As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline.

52.     Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play. Then nearly twenty years after that, in 1952, an article published in the *New England Journal of Medicine* first recommended a three-strike rule for concussions in football, that recommended that players cease to play football permanently after receiving their third concussion.

53.     Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms (commonly known as "EEGs"). Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling that the skull cannot accommodate.

54. Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

55. As a result of these, and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

56. By 1991, Dr. Cantu, the American Academy of Neurology, and Colorado Medical Society developed return-to-play criteria for football players suspected of sustained head injuries.

57. Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play symptomatic, and coined the phrase, "when in doubt, sit them out."

58.     Ultimately, while the NCAA, Pac-12, and University of Oregon knew for decades of the harmful effects of TBI on student-athletes, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the student-athletes, including the football players. For Defendants, the continued expansion and operation of college football was simply too profitable to put at risk.

**III.     The NCAA and Pac-12 Breached Their Duties to Their Student-Athletes By Concealing the Dangers of Concussions and Refusing to Implement Reasonable Concussion Management Protocols.**

59.     For decades, the NCAA, Pac-12, and University of Oregon have been aware that severe head impacts can lead to long-term brain injury, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA, Pac-12, and University of Oregon knew about the harmful and devastating effects of these sub-concussive and concussive injuries, they actively concealed these facts from student-athletes and the public.

60.     In fact, on information and belief, during every decade referenced above, the NCAA, Pac-12, and University of Oregon were advised by physicians and researchers of the severe risks associated with playing football, including the risks associated with TBI.

61.     Rather than inform their student-athletes of these risks or implement protocols to protect and safeguard them from TBI-related injuries (as, at least, the NCAA and Pac-12 promised to do through the NCAA Constitution, among other things), the NCAA, Pac-12, and University of Oregon failed to adopt any of the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

62.     Instead, and in complete disregard of the vast body of known scientific evidence and the resources and authority possessed by NCAA, Pac-12, and University of Oregon, up until 2010, Defendants orchestrated an approach to football practices and games that:

- ignored the medical risks to Plaintiff and other University of Oregon football players;

- aggravated and enhanced the medical risks to Plaintiff and other University of Oregon football players;

- failed to educate Plaintiff and other University of Oregon football players of the link between TBIs in amateur football and chronic neurological

damage, illnesses, and decline;

- failed to implement or enforce any system that would reasonably have mitigated, prevented, or addressed TBIs suffered by Plaintiff and other University of Oregon football players; and

- failed to timely implement "return to play" guidelines for student-athletes who sustain concussions.

63.     Indeed, the NCAA didn't even acknowledge the dangers of concussions in its Sports Medicine Handbook until 1994 when it added what it captioned "Guideline 2o": "Concussions and Second Impact Syndrome." But rather than mandating a specific treatment protocol for member institutions, Guideline 2o left concussion management and treatment to the individual team's discretion.

64.     For example, while the 1998–99 version of Guideline 2o reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," it also stated that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

65.     In this way, Guideline 2o acted as a liability cover for the NCAA without any NCAA enforcement activity to actually protect student-athletes.

66.     As such, despite having actual knowledge of the dangers of concussions, the NCAA refused to implement, endorse, or even recommend specific concussion grading scale or return-to-play criteria.

67.     To make matters worse, University of Oregon completely ignored Guideline 2o and failed to adopt or implement any concussion safety measures or return to play guidelines whatsoever for decades. In fact, University of Oregon's football program had no formal concussion-related safety measures or protocols until 2010.

68.     Moreover, neither the NCAA nor the Pac-12 enforced—and University of Oregon did not comply with—Guideline 2o's statement that: "A student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while

symptomatic."

69.     Ultimately, until 2010, Defendants failed to:

- implement guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or took any action to educate student-athletes about the risks of repetitive head injuries;

- conduct a football program that proactively rewarded Plaintiff and other University of Oregon football players for inflicting head injuries and compelling them to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms. For instance, University of Oregon coaches demanded that University of Oregon football players, including Plaintiff, sustain head injuries and inflict head injuries on other players for the purpose of advancing the University of Oregon football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for University of Oregon, Pac-12, and NCAA; and

- contact Plaintiff and other University of Oregon football players after they left University of Oregon to inform them that had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for University of Oregon.

70.     It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

71.     Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

72.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

73.     Finally, the policy required students to sign a statement "in which they accept the

1  responsibility for reporting their injuries and illnesses, including signs and symptoms of

2  concussion" to medical staff and noted that students would be provided educational materials on

3  concussions during the signing process.

4      74.    However, this policy too is flawed: due to the very nature of concussions, student-

5  athletes suffering concussive injuries are in no position to police themselves or to give informed

6  consent about whether to continue playing. As the NCAA, Pac-12, and University of Oregon have

7  long known, the types of questions used to screen players for concussions include "What's your

8  name?", "What year is it?", and "What sport are we playing?".  These types of questions are used

9  for screening precisely because players experiencing concussions routinely fail to answer them

10  correctly. A player who cannot state his or her own name is in no condition to make an informed

11  decision about whether or not to continue playing, and is entirely dependent on others, such as

12  NCAA, Pac-12, or University of Oregon, to identify concussive injuries in real-time and take

13  appropriate remedial actions. For an injured student, Defendants stand in the role of a guardian

14  tasked with making decisions in the student's best interest. For decades, Defendants have failed to

15  fulfill that role and have instead acted in their own best interest, all to the life long detriment of

16  thousands of 18 to 22 year olds.

17      75.    In the end, these (still deficient) policies were implemented far too late for Plaintiff

18  and the Class, who suffered reasonably foreseeable harm as a result of the NCAA's, Pac-12's, and

19  University of Oregon's actions.

20                 **FACTS SPECIFIC TO PLAINTIFF COOK**

21      76.    Plaintiff Daniel Lee Cook played football from 1971 to 1973 at the University of

22  Oregon. An offensive lineman for the Ducks, Cook played both Guard and Right Tackle during his

23  playing career. A teammate of future Hall of Fame quarterback Dan Fouts, Cook sustained multiple

24  concussions and was repeatedly knocked out, as many as 15 to 30 times during his playing time and

25  particularly during his freshman year. He sustained at least 4 episodes of loss of consciousness

26  lasting two to three minutes.

27      77.    After a successful collegiate career, Cook obtained a masters degree in education and

28

became a middle school teacher, but he ultimately resigned his position after a 30-year career because he could no longer effectively function as an educator. Cook has struggled with the impacts and consequences of his playing career over his lifetime. Once Cook's cognitive challenges became apparent to his employers and family members, he began to be treated by neurologists and neuropsychologists. Cook's cognitive function has reached a point where he has had to come under the care of family members, often living with them for extended periods of time, and he is now disabled. Cook has been diagnosed with dementia.

78.    At all times since the inception of Oregon's football program, through at least 2010, there were no concussion management protocols or policies of any kind in place at Oregon to address and treat concussions sustained by student-athletes during practice and in games.

79.    In fact, although Plaintiff sustained repetitive concussive and sub-concussive hits in practices and games for the profit and promotion of Oregon and the NCAA and Pac-12, Defendants failed to adopt or implement any concussion management safety protocols or return to play guidelines whatsoever during his time on Oregon's football team.

80.    Accordingly, every time Plaintiff suffered a concussive or sub-concussive hit, he immediately returned to the field of play.

81.    Likewise, each time Plaintiff suffered a concussive or sub-concussive hit, he was deprived by Defendants of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBIs.

82.    As a result, Plaintiff now suffers from deficits in cognitive functioning, reduced processing speed, decline in attention and reasoning, loss of memory, sleeplessness, and mood swings, among other issues.

## CLASS ALLEGATIONS

83.    **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Class defined as follows:

> All individuals who participated in the University of Oregon's varsity football program between 1964 and 2010.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

84.     **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of University of Oregon football players fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

85.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

(a)     Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)     Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

(c)     Whether Defendants' conduct as alleged herein constitutes a breach of duty;

(d)     Whether Defendants' conduct as alleged herein constitutes negligence;

(e)     Whether Defendants' conduct as alleged herein constitutes breach of contract;

(f)     Whether Defendants' conduct as alleged herein constitutes fraudulent concealment;

(g)     Whether Defendants' were unjustly enriched at the expense of Plaintiff and the Class; and

(h)     Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

86.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

87.     **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

88.     **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(Individually and on Behalf of the Class as Against All Defendants)**

89.     Plaintiff incorporates by reference the foregoing allegations.

90.     From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and

regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players. Defendant Pac-12 shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

91.    The duties of all Defendants included an obligation to supervise, regulate, and monitor the rules of the University of Oregon football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to University of Oregon football players.

92.    Defendants NCAA and Pac-12 had a duty to educate University of Oregon and University of Oregon football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. The NCAA's and Pac-12 duty further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

93.    Defendants had a duty not to conceal material information from University of Oregon football players, including Plaintiff.

94.    Defendants breached their duties to Plaintiff by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in locker rooms, and in the weeks and months after University of Oregon football players sustained TBIs, as well as providing treatment for the latent effects of TBI. These failings include, but is not limited to:

    (a)    failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

    (b)    failing to inform the student football players of the dangers of concussive and sub-concussive injuries;

    (c)    failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;

(d)     failing to implement procedures to monitor the health of football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to inform the football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Plaintiff left University of Oregon.

95.     Defendants breached their duties to Plaintiff by fraudulently concealing and/or failing to disclose and/or failing to recognize and/or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

96.     Defendants breached their duty to Plaintiff by actively teaching and encouraging University of Oregon football players to inflict head injuries on themselves and others as an effective way to play football.

97.     Plaintiff relied upon the guidance, expertise, and instruction of Defendants in understanding risks associated with the serious and life-altering medical issue of concussive and sub-concussive risk in football.

98.     At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Plaintiff, Defendants knew or should have known that Plaintiff would act and rely upon the guidance, expertise, and instruction of Defendants on this crucial medical issue, while at University of Oregon and thereafter.

99.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a

signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

100.    Plaintiff experienced repetitive sub-concussive and concussive brain impacts during his college football career that significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

101.    The repetitive head accelerations and hits to which Plaintiff was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and concealment, the risks of harm to Plaintiff would have been materially lower, and Plaintiff would not have sustained the brain damage from which he currently suffers.

102.    The repetitive head impacts and TBIs Plaintiff sustained while playing football at University of Oregon resulted in neuro-cognitive and neuro-behavioral changes in Plaintiff, including neuro-cognitive disability, decline, and forgetfulness, all of which will require future medical care.

103.    As a direct and proximate result of Defendants' negligence, Plaintiff has incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Plaintiff will likely incur future damages caused by Defendants' negligence.

104.    As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### SECOND CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
### (Individually and on Behalf of the Class as Against All Defendants)

105.    Plaintiff incorporates by reference the foregoing allegations.

106.    Defendants knew that repetitive head impacts in football games and full-contact practices created a risk of harm to student-athletes that was similar or identical to the risk boxers'

faced when receiving repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

107.    Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which University of Oregon football players were exposed.

108.    Defendants were willfully blind to and/or knowingly concealed from Plaintiff and the Class the risks of TBI in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

109.    Through concealment of material facts, Defendants intended to induce a false belief, under circumstances creating a duty to speak. Defendants intended to induce a false belief that Plaintiff and the Class should continue to play football and should not be prevented from playing football after a concussion or several concussions that should have required time to heal.

110.    Plaintiff and the Class could not have reasonably been expected to know or discover the truth about the risks associated with sub-concussive or concussive injuries, or were prevented or mislead from obtaining such truthful information. Plaintiff and the Class were under the care and treatment of Defendants and justifiably relied on their silence as representing facts that did not exist.

111.    Given Defendants' superior and unique vantage point, Plaintiff reasonably looked to Defendants for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts he sustained while a football player at University of Oregon.

112.    The concealed information was such that Plaintiff and the Class would have acted differently if they had been aware of the material facts known to, and concealed by, Defendants. Had Plaintiff and members of the Class known the full facts in Defendants' possession, they would: not have continued to play after an injury; or would have taken additional time to allow their brain injuries to heal before returning to play; or would have taken additional precautions while playing football; or would not have continued to play college football at all. Despite Defendants'

knowledge, they failed to act reasonably by developing appropriate guidelines or rules regarding return to play criteria and other safety procedures. The Defendants' inaction and concealment increased the risk of long-term injury and illness in their student-athletes.

113.    As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiff has suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

114.    As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT
### (Individually and on Behalf of the Class as Against Defendant NCAA)

115.    Plaintiff incorporates by reference the foregoing allegations.

116.    As a football player at University of Oregon, an institution governed by the NCAA, Plaintiff was required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required Plaintiff to complete a form affirming that he has read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA Division bylaws.

117.    In exchange for Plaintiff's agreement, the NCAA promised to perform certain services and functions, including, inter alia:

- conducting intercollegiate athletics "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2;

- requiring that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3; and

- requiring that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an

integral part of the student-athlete's educational experience." NCAA
Const., Art. 2, § 2.2.

118.    By signing and agreeing to abide by NCAA regulations, and thereafter participating
in a NCAA sanctioned sports program in accordance with such regulations, Plaintiff and the Class
fulfilled their contractual obligations to the NCAA.

119.    As described in the foregoing allegations, the NCAA breached the Parties'
agreement by failing to ensure that its student-athletes were provided with a safe environment in
which to participate in their NCAA sport activities. The NCAA further breached the contract by
concealing and/or failing to properly educate and warn players about the symptoms and long-term
risks of concussions and concussion-related traumatic injury.

120.    Plaintiff entered into a written agreement with NCAA in which he committed to play
football at University of Oregon, to attend University of Oregon as a student, and to comply with all
codes of conduct and obligations as both a football player and student at University of Oregon.

121.    Plaintiff fulfilled his obligations under the contract by playing football at University
of Oregon.

122.    NCAA's contractual breaches with Plaintiff and the Class caused Plaintiff and the
Class to suffer physical injury and damages in the form of past, ongoing, and future medical
expenses.

123.    As a result of their misconduct, Defendant NCAA is liable to Plaintiff for the full
measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class,
seeks actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys'
fees, expenses, and costs to the extent allowable.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(Individually and on Behalf of the Class as Against all Defendants)**

124.    Plaintiff incorporates by reference the foregoing allegations.

125.    To the extent that an express written contract cannot be established among Plaintiff,
the Class, and Defendants, the facts set forth above support the finding of an implied contract.

126.    Under the implied contract, student-athletes agreed to be bound by NCAA and Pac-12 rules and regulations in exchange for their participation in NCAA and Pac-12 controlled athletic programs, including the University of Oregon football program. As a condition of the implied contract, the NCAA agreed to abide by, and Pac-12 agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

127.    Plaintiff and the Class indicated their acceptance of the contract, and further, fully performed under the contract, by participating in the University of Oregon football program in accordance with NCAA and Pac-12 rules and regulations.

128.    Defendants breached their implied contractual duties by failing to ensure that student-athletes were provided with a safe environment in which to participate in football activities. Defendants further breached their contracts by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

129.    Defendants' breach caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' breaches.

130.    As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class as**
**Third-Party Beneficiaries as Against Defendant NCAA)**

131.    Plaintiff incorporates by reference the foregoing allegations.

132.    To the extent that no express or implied contract is found to exist between Plaintiff and Defendants, an express contract existed between the NCAA and University of Oregon.

133.    Under the terms of that contract, University of Oregon agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

134.    Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, University of Oregon and NCAA agreed to, among other things: (1) "conduct[] [intercollegiate athletic programs] in a manner designed to protect and enhance the physical and educational well-being of student athletes"; and (2) "protect the health of and provide a safe environment for each of its participating student-athletes."

135.    Plaintiff and the Class are the intended third-party beneficiaries of the contract between the NCAA and University of Oregon. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA organization.

136.    NCAA and University of Oregon breached their contractual duties owed to Plaintiff and the Class under that contract by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to adequately inform and educate University of Oregon football players on the symptoms and long-term dangers of concussions and concussion-related injuries.

137.    As a direct result of NCAA's and Oregon's breach, Plaintiff and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by NCAA's and Oregon's conduct.

138.    As a result of their misconduct, Defendant NCAA is liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for NCAA's and Oregon's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (*In the Alternative to Breach of Contract*)
### (Individually and on Behalf of the Class as Against All Defendants)

139.    Plaintiff incorporates by reference the foregoing allegations, excluding paragraphs 115-138.

140.    Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

141.    Defendants appreciate and have knowledge of such benefits.

142.    Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiff and the Class while refusing to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

143.    Plaintiff, individually and on behalf of the Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received as a result of its conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daniel Lee Cook, individually and on behalf of the Class, requests that the Court enter an Order providing for the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

B.    Declare that Defendants' actions, as set out above, constitute negligence, fraudulent concealment, breach of contract, and unjust enrichment;

C.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' misconduct;

1        D.      Award Plaintiff and the Class their reasonable litigation costs and attorneys' fees;

2        E.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent

3 allowable;

4        F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of

5 Plaintiff and the Class; and

6        G.     Award such other and further relief as equity and justice may require.

7                                    **JURY DEMAND**

8        Plaintiff demands a trial by jury for all issues so triable.

9                            Respectfully submitted,

10                            **DANIEL LEE COOK**, individually and on behalf of
all others similarly situated,

11

12 Dated: May 17, 2016              By: /s/ Todd M. Logan
                                      One of Plaintiff's Attorneys

13

14                         Todd M. Logan (SBN – 305912)
                         tlogan@edelson.com

15                         Rafey S. Balabanian*
                         rbalabanian@edelson.com

16                         EDELSON PC
                         329 Bryant Street

17                         San Francisco, California 94107
                         Tel: 415.212.9300

18                         Fax: 415.373.9435

19                         Jeff Raizner*
                         jraizner@raiznerlaw.com

20                         RAIZNER SLANIA LLP
                         2402 Dunlavy Street

21                         Houston, Texas 77006
                         Tel: 844.456.4823

22                         Fax: 713.554.9098

23                         John Driscoll*
                         john@thedriscollfirm.com

24                         THE DRISCOLL FIRM, P.C.
                         211 North Broadway, 40th Floor

25                         St. Louis, Missouri 63102
                         Tel: 314.932.3232

26

27                         * *Pro hac vice* application to be filed.

28